UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>SABRINA IKAR,<br>Defendant. | Criminal No. 15-227 (JRT/JSM)<br>**POSITION OF THE DEFENDANT WITH RESPECT TO SENTENCING** |

## INTRODUCTION

Sabrina Ikar is a 23 year old Somalia mother of two small children who was born in a refugee camp in Kenya and came to the United States with her family when she was five. Her family relocated to Rochester, Minnesota, and her father was the owner of small Somalia grocery store. Ms. Ikar did not graduate from high school; she married husband co-defendant Fausi Mohamed before she started the 11th grade. She moved in with her new husband's family in the Twin Cities after that (he also is a Somalian who grew up the Twin Cities), and the first of their two children was born when she was eighteen. Ms. Ikar has never been in any kind of legal trouble in her life and, since becoming a mother at age 18, her life has more or less consisted of taking care of babies. This is a person whose worldly experience is quite limited by her upbringing and circumstances; it is appropriate to characterize her as rather "naive' in many respects, including her subservience to her husband, her involvement in these charges, and her involvement with the criminal justice system. She regrets her involvement in this case in

which she falsified ATF forms in order to purchase several guns for the benefit of her husband, who, as will be explored further, had a knack for getting in trouble and losing those guns.

Ms. Ikar pled guilty to one count of conspiracy and one count of aiding and abetting providing false statements during the acquisition of a firearm in violation of 18 U.S.C. §§ 371, 922(a)(6) and 924(a)(2). As noted, the charges stem from purchases of guns for her husband in which she falsely claimed the she was the bona fide purchaser of the guns. While the guideline technicalities and implications of these false "nominee" purchases are somewhat attenuated, the simple reason her co-defendant husband had her purchase these guns is that he did not want to buy them in his name. He told her to buy them in her name and she complied with his directives. For this rather young traditional Somalian in a traditional relationship, she did what she was asked even though she knew it was wrong. She did it, she knows she should not have, and now she is here, in serious trouble for the first time in her life, and she regrets what she has done.

The plea agreement sets forth the parties respective positions as to the applicable sentencing guidelines, the major differences stemming from whether she knew her husband was a "prohibited person" due to his marijuana use, whether there should be a 4 level enhancement because the offense involves "trafficking;" and whether there should be another 4 level increase because the guns were used or possessed in connection with another felony offense. In summary, the government's view is that the total adjusted

offense level is 21 which, with a criminal history category I, would result in an advisory guideline range of 37 to 46 months. The defense view is that the total adjusted guidelines offense level is 12 with a corresponding guideline range of 10 to 16 months.

However, it is both party's view that the guidelines, however interpreted, do not call for the appropriate sentence here. It is the defense view that this is not a case where imprisoning Ms. Ikar is necessary to satisfy the purposes of sentencing. This case involves a young mother who up until her husband decided that he needed to arm himself had led a very sheltered and completely lawful life devoid of dysfunction, drugs, or any type of involvement in crime. It is quite patent that she is here in large part because of her husband and his misbehavior. This is a 23 year old mother with two small children who lives at home with her own mother and siblings; she has no criminal history whatsoever or leanings in that direction. In short, given her relative culpability, her lack of substantive criminal record, and her overall individual circumstances, a probationary sentence that substitutes home confinement, community service, and continued education as an alternative to imprisonment is appropriate in this case. A sentence of probation is consistent with this Court's overall sentencing directive to impose a sentence "sufficient but not greater than necessary,"and consistent with the sentencing factors set forth in 18 U.S.C. § 3553(a).

## FACTS

Sabrina Ikar is 23 years old. Her parents are Somalian, although she was born in Kenya in 1993. She has seven siblings, three of whom are older and live outside the family household, and she has four younger siblings between the ages 3-12 who, like herself, live at home with their mother in Rochester. Ms. Ikar was too young to remember much about her family's early circumstances, but her parents left Somalia before she was born due to the civil unrest in their country and to avoid persecution; she was born in Kenya after they were displaced as refugees. When she was four or five, the family was sponsored and immigrated to the United States where they relocated in Atlanta. Ms. Ikar's family lived in Atlanta until 2000 or so. The family then moved to Rochester, Minnesota, where they had relatives, and her father opened a Somalian grocery store. She was in third grade when they moved.

Ms. Ikar had a pleasant upbringing in a traditional Muslim family in Rochester, although they were quite poor. In 10th grade, Sabrina met Fausi Mohamed at a Muslim wedding in Rochester; he was from a family in the Twin Cities. She was in high school in Rochester, and he lived in the Twin Cities with his family. He also is Somalian. They "dated"to the extent this was possible as teenagers living in different cities. Before she started 11th grade, they decided to get married. He asked her father for permission to get married in the respectful traditional Somalian manner, and the families approved the marriage.

Sabrina and Fausi were married in a traditional Somalian Muslim ceremony on August 20, 2011. She was 18. After they married, Ms. Ikar moved in with Fausi's family in the twin cities, and she started 11th grade at an alternative school. She got pregnant in the fall of 2011 shortly after they got married, and had pregnancy sickness problems and did not finish the school year. Their son was born in June, 2012.

Sabrina and Fausi lived with his parents for most of the next three years. She worked a few jobs, took some additional classes, and mostly took care of the baby while he worked for his father at a coffee shop. They had a baby girl two years after their son; she was born in August of 2014. The children are now three and one years old; she also is pregnant again and their third baby is due April 26, 2016.

Sabrina Ikar has never been arrested or in any sort of legal trouble until these charges. She does not drink or use drugs. She has spent most of the last few years pregnant and raising babies. She has worked sporadically between pregnancies, which have typically been difficult. She lived with her somewhat traditional Muslim Somali family in Rochester until she moved to the Twin Cities after she married, and has lived most of the next three years with Fausi's family. This has been a somewhat sheltered life and she has not lived a law of unlawful behavior by any means.

There did not seem to be many problems in her life until the two of them moved out on their own and got their own apartment in Burnsville in the fall of 2014. She had a new baby and a two year old that she was taking care of, and Fausi was working for his

father at the Somali Mall. She is somewhat sheltered and perhaps even a bit naive, and not entirely in the know about whatever else he may have been up to (still not clear) but come the winter of 2015, he was having problems, seemed to now have some enemies and people who did not like him, and he became increasingly concerned about his own safety. She was alone most of the time anyway with two young children. In February, 2015, she took the required classes and obtained her "conceal and carry" permit; the various gun purchases in her name followed shortly thereafter.

She did know that he smoked marijuana but she did not approve of it and did not like it. She has never used drugs or alcohol he did not smoke around her or the children. He was out doing his own thing most of the time while she stayed in their little apartment in Burnsville and took care of the two babies. She wasn't exactly thrilled or enamored with this life but it is what her life became. He claimed he was in danger, and there were some strange things going on around them, so when he asked her, she bought the guns. He took them out of the house and they kept getting confiscated. Every time he got in trouble he made excuses and told her various stories; its rather to hard to sort out the truth. It's safe to say that he was less than honest with his wife, but she bought guns for him in her name on five occasions in the winter and spring of 2015.

She bought the six guns for him between February 14, 2015, and June 9th, most of which he lost, i.e. were confiscated following traffic stops of one sort or another, and two more were confiscated after he was questioned following an attempted burglary on June

4th. The PSR prominently points to his misbehavior, none of which involved her or which she had any advance role or participation with. Finally, the PSR references the shooting on June 27th, which he has consistently insisted was accidental; and that case continues to make itself way through the state courts.

**THE GUIDELINE ISSUES**

The guideline issues presented here are somewhat academic given the parties' respective sentencing positions. These are somewhat technical in defense counsel's eyes and do very little to illuminate what the proper disposition should be for this young mother and first time offender. As to these guideline issues, the first issue is whether Ms. Ikar knew that her husband's marijuana smoking made him a "prohibited person" such that she is subject to the higher starting base offense (12 vs 14) for this false statement case. USSG § 2K2.1. Simply stated, Ms. Ikar was not aware that her husband's marijuana use prohibited him from possessing a firearm. It should be noted that Fausi Mohamed kept his drug use to himself and he did not use around her or the children. Ms. Ikar does not and never has used marijuana or any or other drugs; in addition, during most of their relationship, the two of them lived with his family. Although she acknowledges that she was aware that he smoked pot (which she disapproved), this alone is not a sufficient basis for applying the higher base offense level. In order for the higher base offense level to be applied, she must have "knowledge, intent, or reason to believe" that the transfer was to a "prohibited person" under the law. There is little evidence that she

knew his pot smoking made him a "prohibited person," she bought the guns in his name because he insisted that she do it for him as he obviously did not want the guns in his own name, not because he was prohibited from purchasing them himself. Accordingly, the higher base offense level should not be applied and the guideline base offense level should be 12.

As to the four point "trafficking" enhancement, we view the guideline's definition as overly nuanced and a technical interpretation of a rather simple concept. While it is the defense's view that these additional four points should be limited to cases of those who illegally "traffic" in weapons in the common parlance of the term - sales for profit, the guidelines admittedly contain a much broader definition. The guidelines advise these four points should be applied in cases involving the transfer of two or more guns to another person (which is satisfied here) to someone for whom receipt or possession would be "unlawful". USSG § 2K2.1(b)(5). However, the guidelines limit the "unlawful" definition to those persons who are prohibited because of prior convictions, (crimes of violence, controlled substance offenses, or domestic assault) none of which apply here; the prohibition for being a marijuana user is not captured under the "unlawful" definition of this particular guideline provision. See Guideline §2K2.1, Application Notes 13(B). The trafficking enhancement also applies if the transfer was to an individual that "intended to use or dispose of the firearm illegally" but, as noted below, it is our position that Ms. Ikar did know of her husband's future intended use of the firearms as he

continued to insist that he needed them for protection and she was not involved in any of his subsequent activities.[1] In short, the four point "trafficking" enhancement should not be applied in this particular case.

Finally, it is the defense position that the four point enhancement for use of a gun "in connection with" another felony under USSG § 2K2.1(b)(6)(B) should not be applied as to her. Ms. Ikar did not aid and abet or otherwise assist her husband in any illegal activities, nor was she a co-conspirator or otherwise involved in any of his other activities. Moreover, he was less than honest with her concerning the circumstances of his various arrests. In addition, although the PSR lists a number of arrests and various incidents, the PSR does not mention any specific felonies but rather makes a nice chart with a list of his general misbehavior, most of which is uncharged behavior and are not felonies. The one felony we are aware of here is the shooting at the end of June, which Mr. Mohamed has consistently described as an accident and remains unresolved. More importantly, as to Ms. Ikar, she surely had no knowledge that he was going to be involved in an accidental shooting three weeks or so after he obtained the gun and she again was not an accomplice, conspirator, or aider and abettor of this or other felony incidents. The PSR's suggestion here is that she should get four more points because she should have known that he was generally up to no good with these firearms, unfortunately, that is not

[1] See also: Guideline §2K2.1, Application Note 13 (B); specifying that the definition for applying the (b)(5) trafficking enhancement "limits the accountability of the defendant to the defendant's own conduct and conduct that the defendant aided and abetted, counseled, commanded, induced, procured or willfully caused."

what is required for liability for this enhancement. CF. United States v. Scott, 503 F. Supp.2d 1097 (E.D. Wisc 2007) (Judge Adleman declines to apply the enhancement in a somewhat similar case and imposes a probationary sentence). As to Ms. Ikar, the enhancement should not be applied.

It is thus the defense position that the adjusted offense level should be 12 (12 base + 2 number of weapons - 2 acceptance of responsibility), which results in a guideline range of 10 - 16 months.

**§3553(a) DISCUSSION-WHAT IS A REASONABLE SENTENCE?**

Regardless of the court's resolution of the guideline issues, neither party is asking that the court rely on those guidelines to determine the appropriate sentence in this case. The guidelines, of course, are only advisory and the guidelines are not entitled to a presumption of reasonableness, nor do they appear reasonable in this particular case. "The Guidelines are not only ***not mandatory*** on sentencing courts; **they are also not to be *presumed* reasonable**." Nelson v. United States, 129 S.Ct. 890, 894 (2009)(emphasis added). Even in pre-guidelines practice, the fact that the sentencing guideline calculations were determined to be arithmetically accurate, however, still did not mean that they constituted an appropriate, reasonable, and just sentence in any case. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to

ensue." Koon v. United States, 518 U.S. 81, 113 (1996). The Supreme Court has ruled emphatically that the guideline sentence is not to be presumed reasonable in any individual case and that the Court "must make an **individualized assessment** based on the facts presented" in each case. Gall v. United States, 128 S.C. 586, 602 (2007).

In Booker, the United States Supreme Court held that the United States Sentencing Guidelines are advisory, and that District Courts must examine all factors set forth in 18 U.S.C. §3553(a) and impose a sentence that is "sufficient but not greater than necessary" to accomplish the goals of sentencing. United States v. Booker, 543 U.S. 220 (2005). The triad of 2007 Supreme Court decisions made clear that Federal Courts must determine sentences based on the facts and unique circumstances of the particular case, and that the guidelines do not enjoy a presumption of reasonableness. Gall v. United States, 128 S.C. 586, 602 (2007) (finding a probationary sentence, substantially outside of the guidelines, to be reasonable); Kimbrough v. United States, 128 S.C. 558, 570 (2007) (noting that Courts may vary from guidelines ranges based solely on policy considerations, including disagreements with the guidelines); Rita v. United States, 127 S.C. 2456, 2465 (2007) (holding that a District Court may consider arguments that "the Guidelines sentence itself fails properly to reflect §3553(a) considerations"). These decisions "mean that the District Court is free to make its own reasonable application of the §3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." Kimbrough, 128 S.C. at 577 (Scalia, J., concurring). The "truly advisory" holding of

these cases was made abundantly clear by Justice Stevens: "I trust that those judges who had treated the Guidelines as virtually mandatory during the post-Booker interregnum will now recognize that **the Guidelines are truly advisory**." Rita, 127 S.Ct. at 2474 (J. Stevens, concurring)(emphasis added).

In two of its post Gall opinions, the Supreme Court reemphasized that it is proper for a District Court to reject the guidelines and that the guidelines are not entitled to a presumption of reasonableness. In Spears v. United States, 129 S.Ct. 840 (2009), the Court again reversed the Eight Circuit in a crack cocaine sentencing case, stating that Courts are free to reject the guidelines based on either an individualized assessment or categorical rejection of the guidelines: "[W]e now clarify that District Courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." Id. at 843-844.

Similarly, in Nelson v. United States, 129 S.Ct. 890 (2009), the Court reversed the Fourth Circuit for affirming a within-guidelines sentence despite the sentencing judge's statements at sentencing that "the Guidelines are considered presumptively reasonable" and that "unless there's a good reason in the [3553(a)] factors . . ., the Guidelines sentence is the reasonable sentence." The Supreme Court observed:

> The Guidelines are not only ***not mandatory*** on sentencing courts; **they are also not to be *presumed* reasonable**. We think it plain from the comments of the sentencing judge that he did apply a presumption of reasonableness to Nelson's Guidelines range. Under our recent precedents, that constitutes error.

Id. (Emphasis in original, bold face added).

This is a case where a young person, a rather unsophisticated and naive mother of two small children, purchased guns on several occasions at the request and insistence of her husband. Although she does not want to admit it, there appears to be some element of abuse within the relationship. She was raised in a rather traditional Somalia family, where the marriage of an 11th grader was permitted and accepted, and woman are subservient to their husbands. She became pregnant soon after they were married, and she has spent most of the last three years being pregnant and having babies. Another baby is expected at the end of April. The fact of having a three year old, a one year old, and another on the way is difficult to ignore here, and there are practicalities and some element of compassion which should still play into this court's sentencing decision.

Ms. Ikar is truly a first time offender of any sort, and she knows that what she did was wrong, and is appropriately remorseful. She hasn't offered up excuses nor is she blaming her husband for her role in making these false statements on these ATF forms; although there is an element of coercion in this relationship, he did not force her to do this and she is not going to go easy on herself and just blame him. Yes, she is disappointed with his behavior and certainly feels an element of betrayal and dishonesty in his dealings with her, and she knows they will have to sort out if they are to have future together. But she is good mother and is at heart a good person, she is pleasant, funny, and caring, and she intends to do right if given the opportunity. As a true first offender, there is

something to be said for giving her a second chance, a chance to demonstrate that she can put this mishap aside and return to the normal, law abiding life she have lived throughout the rest of her life. She has demonstrated by her spotless record on pretrial release that she can follow the rules and restrictions of supervision, and she can be trusted to follow any restrictions or sanctions imposed by the court. She also does not use drugs or alcohol, and has no mental illness or other dysfunction driving her behavior. Her husband also will certainly be looking at a significant term of imprisonment for this offense, and the wisdom of imprisoning her as well is questionable in light of their small children and pending pregnancy.

The statutory purposes of sentencing will also be more than satisfied by a sentence of probation in this case that maximizes community confinement, home detention, and community service as an alternative to imprisonment, as well as a requirement that she complete her GED while on supervision. General and specific deterrence and promoting respect for the law are satisfied by this prosecution and her felony record; indeed, the felony prohibition alone will ensure that she never can purchase or possess a weapon in the future. That is certainly a lesson that she understands. In addition, she has no treatment or behavioral needs that prison needs to address, nor would a probationary sentence for a first time offender with two small children under the facts of this case result in an unwarranted sentencing disparity.

Ms. Ikar knows that she only gets one chance here. She is also not entrenched in dysfunctional criminal behavior, and she has the wherewithal and commitment to use this case as an opportunity to change her ways. District Courts have taken to heart the Supreme Court's dictate "to impose a sentence sufficient, but not greater than necessary, to comply with the basic aims of sentencing" in §3553(a). Rita v. United States, 127 S.Ct. 2356, 2463 (2007). Incarceration is simply not necessary in every case. As stated in Gall, offenders on probation or supervised release are subject "to several standard conditions that substantially restrict their liberty." 128 S.Ct. at 595. As stated by the district court in Gall:

> Any term of imprisonment in this case would be counter effective by depriving society of the contributions of the Defendant who, the court has found, understands the consequences of his criminal conduct and is doing everything in his power to forge a new life.

Gall, 128 S.Ct. at 593. Id.

In conclusion, Ms. Ikar's felony conviction is in itself a significant punishment. Incarceration is not always the answer, and there are cases where lock-up serves little societal interest, does not advance the purposes of sentencing, and results in a sentence "greater than necessary" to comply with the purposes of sentencing under 18 U.S.C. §3553(a). This is a person who committed a crime, has owned up to it, and is appropriately remorseful. She asks for a second chance, and promises not to let either the court, the people around her, or her young children down. A sentence of probation that

maximizes the use of home confinement and community service, and assists her with furthering her education, as components of a non-prison disposition is requested.

Dated: February 23, 2016

Respectfully submitted,

*s/Douglas Olson*

_________________________________

DOUGLAS OLSON
Attorney ID No. 169067
Attorney for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415